UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROMAN KAINZ,

           Plaintiff,

    v.

BRUCE T. BERNSTEIN, RICHARD K. ABBE,
ANDREW R. HEYER, DONALD E. STOUT,
SALVATORE GIARDINA, JOHN ENGELMAN,
ANDREW D. PERLMAN, WILLIAM PHOENIX,
and XPRESSPA GROUP, INC. f/k/a FORM
HOLDINGS CORP.,

           Defendants,

Civil Action No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Roman Kainz ("Plaintiff"), by his undersigned attorneys, as and for his complaint against Bruce T. Bernstein, Richard K. Abbe, Andrew R. Heyer, Salvatore Giardina, Donald E. Stout, John Engelman, Andrew D. Perlman, William Phoenix, and XpresSpa Group, Inc. f/k/a Form Holdings Corp. ("New XpresSpa" or the "Company" and together with all the foregoing defendants, the "Defendants"), alleges on the basis of knowledge with respect to himself and his actions, and on the basis of knowledge and information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Plaintiff seeks recovery from the Defendants for violations of the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), breach of contract, and fraud in the inducement for damages resulting from misrepresentations and omissions made by Defendants in connection with the merger of XpresSpa Holdings, LLC ("Original XpresSpa") into Defendant New XpresSpa, a corporation whose shares are listed on The NASDAQ Capital Markets ("NASDAQ").

2.      Since at least 2008, Plaintiff has been an investor in the airport spa business known to the public under the brand name "XpresSpa." With the support of Plaintiff's investment, among others, by 2015 Original XpresSpa had grown into an international brand with over 40 locations around the world with annual revenues of approximately $40 million. In 2016, the board of directors of Original XpresSpa, controlled by Defendants Bernstein and Heyer, advised the members to vote in favor of a merger with New XpresSpa. The gravamen of this action is that Defendants concealed the truth and otherwise misled and deceived Plaintiff into agreeing to exchange his valuable interest in Original XpresSpa for shares in a public company that was essentially a shell with no genuine, ongoing business or capital of its own and subject to onerous loan covenants and a self-interested, conflicted, and non-independent board of directors.

3.      Defendants Bernstein, Abbe, Perlman, and Giardina (together, the "Controlling Group") worked together with Defendant Heyer as part of a deliberate and undisclosed scheme to take control of Defendant New XpresSpa's board of directors and effect the merger with Original XpresSpa to enrich themselves at Plaintiff's expense. Defendants tricked Plaintiff and other members of Original XpresSpa by making various misrepresentations and half-truths, and otherwise omitting material facts from prospectuses, proxy statements, and other certain key disclosures, and employing manipulative devices in order to convince Plaintiff to exchange his membership interest in Original XpresSpa for shares in Defendant New XpresSpa. Plaintiff relied on the truthfulness and completeness of Defendants statements and misrepresentations in agreeing to exchange his equity interest in Original XpresSpa for shares of New XpresSpa

4.      Plaintiff's reliance on Defendants' statements caused him damages. Defendants overstated the value of the securities of Defendant New XpresSpa offered as consideration for the merger.  The market price of the shares of Defendant New XpresSpa proffered as consideration

(valued by Defendants at approximately $35 million) was artificially inflated because of Defendants' misstatements concerning the ability of New XpresSpa to access capital to continue to grow the spa business and Defendants' failure to disclose the true nature of the conflicted and non-independent relationships between the members of the Controlling Group and their concerted efforts to enrich themselves at the expense of Plaintiff and other New XpresSpa shareholders.

5.      Once Defendants began, after the merger, to disclose the lack of capital at New XpresSpa, the onerous and highly dilutive means by which Defendants would raise new capital, and the conflicts of interest and prior relationships between the Controlling Group members, the market price of New XpresSpa stock began to fall.

6.      Defendants continue to cause harm to Plaintiff because they continue to hold and control a significant portion of the agreed consideration for the merger (in the form of preferred shares of stock) in escrow, over two years after the close of the merger. Defendants have taken improper charges against the escrow at Plaintiff's expense. Thus, Defendants have not yet transferred the entirety of the consideration underlying the transaction and continue to engage in violations of the securities laws that diminish the value of that consideration.

7.      As detailed below, Defendants are liable to Plaintiff for the damages they have caused as a result of violating the federal securities laws and breaching the terms of their contract with Plaintiff. In this action, Plaintiff seeks rescission of the exchange of his equity for shares of New XpresSpa, compensatory damages, attorneys' fees, and all other just and proper relief.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the common law claims asserted

in this action. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and the Defendants.

9.      Venue is proper in this district in accordance with 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

### Plaintiff

10.      Plaintiff Roman Kainz is an individual residing in the canton of Zurich in the Swiss Confederation.

11.      Plaintiff obtained his shares in New XpresSpa when it acquired Original XpresSpa. As consideration for Plaintiff's membership interest in Original XpresSpa, New XpresSpa promised to deliver to Plaintiff common shares, warrants for common shares, and preferred shares of New XpresSpa stock (the "Merger Consideration"). A substantial portion of the Merger Consideration remains in escrow under the control of the Defendants and, thus, the sale of Original XpresSpa to New XpresSpa remains ongoing.

### Individual Defendants

12.      Defendant Bruce T. Bernstein is an individual residing in New York County and has been a director of New XpresSpa since February 8, 2016 and a member of the compensation and audit committees of the board of directors of New XpresSpa since February 8, 2016.  Bernstein also serves as a member of the nominating and corporate governance committee of New XpresSpa. Before the merger, Bernstein was a member of the board of directors of Original XpresSpa. Bernstein owns and/or controls Rockmore Investment Master Fund Ltd. ("Rockmore"), through which he controls a senior secured note (the "Rockmore Note") and acts on behalf of the Controlling Group.

13.     Defendant Richard K. Abbe is an individual residing in Westchester County, New York. He became a director of New XpresSpa as of March 9, 2016.  Abbe owns and/or controls Iroquois Master Fund Ltd. ("Iroquois"), an investment vehicle through which he acts on behalf of the Controlling Group. Abbe also owns or controls American Capital Management LLC ("ACM"), another investment vehicle through which Abbe acts on behalf of the Controlling Group. Through ACM, Abbe holds an interest in the Rockmore Note, a senior secured credit facility assumed by New XpresSpa in connection with the merger. Abbe's interest in the Rockmore Note was concealed until long after the merger. After disclosure of his interest in the Rockmore Note, Abbe resigned from the board of New XpresSpa.

14.     Defendant Salvatore Giardina is an individual and has been a director of New XpresSpa since May 23, 2016 and a member of the audit committee of the board of directors since the same date. The Controlling Group has appointed Giardina to director positions in several public companies.

15.     Defendant Andrew D. Perlman is an individual residing in Westchester County, New York and was a director of New XpresSpa from September 2009 until he resigned on April 19, 2018. He also previously served as Chief Executive Officer of New XpresSpa from approximately 2012 until April 2018.

16.     Defendant Andrew R. Heyer is an individual residing in Westchester County, New York.  Heyer has been a director of New XpresSpa since December 23, 2016.  Heyer is the founder and CEO of Mistral Equity Partners (together with its affiliates, "Mistral"). Through Mistral, Heyer exercises control over the Merger Consideration that was promised to Plaintiff but which has not been delivered.

17.     Defendant Donald E. Stout is an individual and has been a director of New XpresSpa since July 19, 2012.   Stout served as a member of the compensation, audit, and nominating and corporate governance committees of the board of directors of New XpresSpa.

18.     Defendant John Engelman is an individual residing in Rockland County and first became a director of New XpresSpa in December 2010. In connection with the annual meeting of shareholders of New XpresSpa held on September 18, 2018, Engelman declined to seek re-election as a director of New XpresSpa.

19.     Defendant William Phoenix is an individual who serves as a Managing Director at Mistral, which owned the majority interest in Original XpresSpa prior to the merger. Defendant Phoenix also acted in the capacity of an officer or agent for Mistral XH Representative, LLC, an affiliate of Mistral that purports to maintain custody and control of the remaining Merger Consideration that has yet to be distributed to Plaintiff and other former members of Original XpresSpa.

## New XpresSpa

20.     Defendant New XpresSpa is a corporation organized and existing under the laws of the State of Delaware. The principal offices of New XpresSpa are located at 780 Third Avenue, 12th Floor, New York, NY 10017.

21.     Throughout the relevant period, New XpresSpa has been listed on NASDAQ.

22.     Prior to 2016, New XpresSpa was known as "Vringo, Inc." and engaged primarily in the business of monetizing patent portfolios through litigation, and before that, was engaged primarily in developing ringtones.

23.     From approximately 2012 until April 2018, Defendant Perlman served as the Chief Executive Officer of New XpresSpa.

24. On January 5, 2018, New XpresSpa changed its legal name from "Form Holdings Corp." to "XpresSpa Group, Inc."

## FACTUAL BACKGROUND

### Original XpresSpa

25. In and around 2003, Moreton Binn and his wife, Marisol Binn, founded the "XpresSpa" brand that ultimately became Original XpresSpa, a health and wellness business that operates spas located in airports. Moreton Binn and Marisol Binn started the XpresSpa business with the first spa at JFK Airport – Terminal 1 and grew the business to about fifty locations around the world.

26. Plaintiff was one of the first investors who contributed outside funds to the venture. By no later than 2008, Plaintiff had invested over $1 million into the XpresSpa business created by Moreton Binn and Marisol Binn.

27. Airport concessions are a competitive business, with just a few corporations holding leases on most of the available concession space. Further, there is a limited supply of airport terminal concession space suitable for the operation of retail spas.

28. In order to grow its business, and avoid the loss of valuable airport concession locations to competitors, Original XpresSpa regularly re-invested its revenues into the acquisition of new locations.

29. Original XpresSpa also developed a team of professionals with the capability and experience to secure new spa locations in competitive bidding environments.

30. By 2015, Original XpresSpa had successfully obtained rights to airport spa locations around the world.

### Original XpresSpa Secured a Merger Commitment
### from Amiral Holdings SAS

31.     In 2015, the board of Original XpresSpa, controlled by Defendants Bernstein and Heyer, was evaluating strategic transactions by which it could obtain a further investment of capital in order to continue the growth of its business.

32.     By October 2015, Original XpresSpa had entered into a binding letter of intent to merge with Amiral Holdings SAS ("Amiral"), the entity that owned and operated the competing brand of "BeRelax" airport spas.

33.     The letter of intent provided the essential terms of the merger, including the investment of approximately $11 million in capital. The terms also provided to Amiral a binding right-of-first-refusal along with a penalty if Original XpresSpa failed to proceed with a merger with Amiral.

34.     Defendant Heyer executed the Amiral letter of intent on behalf of both Original XpresSpa and Mistral on October 5, 2015. The merger described in the letter of intent with Amiral required the approval of the board of directors of Original XpresSpa. Accordingly, Heyer presented the Amiral letter of intent to the board of Original XpresSpa.

35.     During the period relevant to this action, Defendants Bernstein and Heyer were members of the board of directors of Original XpresSpa. Defendant Heyer directed the operations of Mistral, the majority member of Original XpresSpa. Moreton Binn and Marisol F, LLC held voting rights and privileges with respect to Original XpresSpa. Nonetheless, at that time the board of Original XpresSpa was effectively controlled by Bernstein and Heyer.

36.     Further, during the period relevant to this action, Defendant Bernstein, through Rockmore, had a substantial creditor relationship with Original XpresSpa by way of the Rockmore Note.

**The Controlling Group**

37.     Unbeknownst to Plaintiff, however, Defendant Bernstein was one member of the Controlling Group, a group of individuals who worked closely together to obtain and exert control over publicly listed companies for their own self-interest.

38.     The scheme of the Controlling Group would usually begin by one or more of the Controlling Group members, usually via an entity or vehicle he controls, taking a position in a target company by way of the acquisition of a substantial ownership of the target company's stock or by causing one of his investment vehicles to enter into a convertible debt facility or other debt financing on coercive terms.

39.     Following the initial investment, Abbe, Bernstein, or another member of their group, would then use their initial foothold position to cause themselves and other members of the Controlling Group to be appointed to the board of directors of the target company.  Once one member of the Controlling Group is appointed to a board, other members of the Controlling Group are quickly appointed to directorships until the group attains the power to control the affairs of the target company.

40.     Members of the Controlling Group are then appointed to the Audit and Compensation Committees of the target company.  Once the Controlling Group has effected a change of control, they grant themselves valuable compensation and use the target company to refinance the initial investment on favorable terms.

41.     Members of the Controlling Group, acting through various investment vehicles, have implemented schemes to effect changes of control or other coordinated activities with respect to National Holdings Corporation ("NHC"),[1] Neurotrope, Inc. ("Neurotrope"), GeoResources,

---

[1]     For example, in 2014, Salvatore Giardina held a foothold directorship in NHC.  Abbe and a business partner

Inc., USA Technologies, Inc., and TapImmune, Inc.

42.     To effect these schemes, the Controlling Group has used various investment vehicles, such as Rockmore, controlled by Bernstein, and Iroquois[2] and ACM, both investment vehicles controlled by Abbe.

### The Controlling Group Effected a Change of Control in New XpresSpa and the Merger in order to Further Their Own Self-Interest

43.     At the time Bernstein learned of the likelihood of a merger of Original XpresSpa with Amiral, Original XpresSpa was paying to Rockmore approximately $60,000 per month pursuant to the payment terms of the Rockmore Note. Bernstein also enjoyed the benefit of control over Original XpresSpa by way of the onerous covenants in the Rockmore Note.

---

from Iroquois sent a notice of intent to nominate a slate of three directors to stand for election at the upcoming annual meeting to the board of directors.  Following this notice, NHC agreed to an investor settlement agreement that, inter alia, caused Abbe to be appointed to the board of directors and the board to nominate Abbe's Iroquois business partner as a director. Upon the declination of one current director to stand for re-election and the resignation of another board member immediately following the annual meeting, the board of NHC formed a strategy committee to be comprised of six non-management members, including either Abbe or his Iroquois business partner, *inter alia*. Giardina, by way of his undisclosed arrangement with Abbe, remained on the board after the investor settlement agreement. Abbe and his business partner, as well as Giardina, then voted as directed by Abbe and another Iroquois partner, for the purpose of exercising control over the affairs of NHC. Immediately following the Annual Meeting in July 2014, the newly-formed Strategy Committee included Abbe, his Iroquois business partner, and Giardina.  In or about September 2016, Abbe and Giardina caused NHC to complete a tender offer by a subsidiary of Fortress Biotech, Inc., receiving a premium in exchange for their initial investment while diluting the existing shareholders of NHC.

[2]     Bernstein, and Abbe used similar means to effect a change of control of a public company named Neurotrope, Inc. ("Neurotrope"). Neurotrope is a startup biotechnology company that licenses its core technology from another entity. First, Abbe caused Iroquois to take a 9.99% beneficial interest in Neurotrope.  Then, in connection with a public offering disclosed in July 2016, Abbe caused Iroquois to commence litigation against Neurotrope.  Abbe agreed to settle the litigation in exchange for an increase in the size of the board of directors and the appointment of a fellow Iroquois partner to the board of directors of Neurotrope.  Shortly thereafter, the board was increased again and, on November 14, 2016, Bruce Bernstein was appointed as a director of that company. Pursuant to the undisclosed arrangement between Abbe and Bernstein, Bernstein was appointed as the Chairman of the Audit Committee and also a member of the Compensation Committee, Nominating, and Corporate Governance Committees of the board. In short order, Perlman was also elected as a director and appointed to the Audit and Compensation Committees.  Bernstein, Perlman, and Abbe's fellow Iroquois partner all voted to award to themselves, and continue to receive, valuable shares of Neurotrope stock.

44.     Unbeknownst to Plaintiff at that time, Abbe, through his investment vehicle, ACM, held an undisclosed interest in the Rockmore Note. Therefore, Abbe was a beneficiary of the stream of payments that Original XpresSpa paid to Rockmore every month and the control over Original XpresSpa provided through the onerous terms of the Rockmore Note.

45.     A merger of Original XpresSpa into Amiral would have resulted in the discharge of the Rockmore Note and a termination of the revenue stream then being paid to Rockmore. Moreover, the onerous terms and covenants of the Rockmore Note provided to Bernstein substantial control rights and power over Original XpresSpa. A merger resulting in the discharge of the Rockmore Note would deprive Bernstein and Abbe of the ability to exercise control over Original XpresSpa through the onerous covenants of the Rockmore Note.

46.     After learning that the board of Original XpresSpa had entered into a letter of intent with Amiral, Bernstein, Abbe, and other members of the Controlling Group engaged in a scheme to stop the merger with Amiral and instead force a merger of Original XpresSpa into a publicly listed company under their control.

47.     At the time, Perlman was the Chief Executive Officer and a director of New XpresSpa, a public company listed on NASDAQ, and whose patent monetization business had largely wound down.[3]

---

[3]     Beginning in or around August 2014, the New XpresSpa's patent monetization business suffered several negative outcomes.  For example, the United States Court of Appeals for the Federal Circuit reversed a district court finding of patent infringement against Google and in favor of the New XpresSpa. In subsequent proceedings, the Supreme Court of the United States denied the New XpresSpa's request for a writ of certiorari in the Google matter. In January 2015, the People's Republic of China's National Development and Reform Commission (NDRC) threatened the New XpresSpa with criminal sanctions unless the New XpresSpa resolved its ongoing, worldwide patent disputes with ZTE. Following these events, it became clear to Perlman that the New XpresSpa's patent monetization business would no longer generate the returns it previously generated.

48.     With the winding down of its operating business, and no other operating assets of substantial value, New XpresSpa was a device by which the Controlling Group could effect a scheme similar to the ones they had engaged in the past.

49.     In or around 2015, the Controlling Group decided to capitalize on New XpresSpa's distressed circumstances to effect a change in control of New XpresSpa and obtain control over Original XpresSpa, all for their own self-interest.

50.     First, the Controlling Group used Perlman's position at New XpresSpa to cause it to enter into a $12.5 million convertible debt financing with Iroquois, controlled by Abbe. At that time, Perlman knew or should have known that New XpresSpa would shortly settle its remaining patent monetization disputes in exchange for a cash payment. Indeed, less than six months later, in December 2015, New XpresSpa announced a settlement with ZTE Corp. for $21.5 million. The debt facility with Iroquois was otherwise unnecessary to the operation of the New XpresSpa, but subjected New XpresSpa to certain loan covenants that could be used by the Controlling Group to take over control of New XpresSpa. The true purpose of the Iroquois debt facility was to provide the Controlling Group a foothold interest with which to exercise control over New XpresSpa.

51.     Once both Perlman and Abbe had secured this initial leverage over the New XpresSpa, Abbe, Perlman, and Bernstein began coordinated efforts to take control of the board of New XpresSpa and to negotiate a merger of Original XpresSpa into the New XpresSpa.

52.     The basic terms of the merger would require the members of Original XpresSpa to exchange their membership interests for the Merger Consideration, comprising of $2.5 million worth of common shares in New XpresSpa, 494,792 shares of fully paid and nonassessable shares of Series D Convertible Preferred Stock, par value $0.01 per share, and warrants to purchase an aggregate of 2,500,000 shares of common stock with an exercise price of $3.00 per share. The

exact number of common shares to be exchanged would be determined based on the price of the stock as of a date to be mutually agreed upon by Original XpresSpa and the New XpresSpa.

53.     A significant portion of the Merger Consideration that Defendants offered to Plaintiff and other members of Original XpresSpa, however, would be held in escrow for up to eighteen months following the closing. Portions of this Merger Consideration would be released to the former members of Original XpresSpa over time, much like an installment sales contract.

54.     As part of the merger, the Controlling Group proposed that New XpresSpa could elect to pay-off the Rockmore Note after the closing but would otherwise assume the obligations of the Rockmore Note going forward.

55.     In secret, Bernstein and Abbe had no intention of ever paying off the Rockmore Note. The true purpose of transferring the obligations to the New XpresSpa was to permit Bernstein and Abbe to use the onerous covenants of that note to exert undue control over the publicly listed New XpresSpa. Both Bernstein and Abbe intended to obtain positions as members of the board of directors of New XpresSpa before the acquisition. Following the acquisition, New XpresSpa would assume the obligations of the Rockmore Note, Bernstein would beneficially own a 4.7% interest in the New XpresSpa and both Bernstein and Abbe, through Rockmore and ACM, would be able to use their positions on the board and the onerous terms of the Rockmore Note to exert undue control over New XpresSpa.

56.     Once Heyer had agreed to the basic terms of a merger with New XpresSpa, Perlman and Abbe, in their capacities as a director and substantial creditor, respectively, proceeded to use their influence over New XpresSpa to secure board positions for the remaining members of the Controlling Group.

57.     First, on February 8, 2016 they appointed Bernstein as a member of the board of directors and Chair of the Compensation Committee of New XpresSpa. In March 2016, Perlman and Bernstein caused New XpresSpa to appoint Abbe as a director. Following the appointment of Bernstein and Abbe to the board, the Defendants certified that Bernstein satisfied the criteria for independence required under the listing rules of NASDAQ. In May 2016, Perlman, Bernstein, and Abbe caused New XpresSpa to appoint Giardina as a director.  With the appointment of Giardina, the Controlling Group held a majority of seats on the board of directors of New XpresSpa.

58.     Bernstein and Heyer then disclosed to other members of Original XpresSpa the fact that they had been engaged in discussions with New XpresSpa regarding merger and the general terms.

**Bernstein Declared a Default of the Rockmore Note in Bad Faith**

59.     A merger of Original XpresSpa with New XpresSpa would result in a breach of the letter of intent with Amiral. In order to coerce the other members of the board of Original XpresSpa to proceed with a merger of New XpresSpa, and risk liability to Amiral, Bernstein caused Rockmore, on June 7, 2016, to declare Original XpresSpa in default of the Rockmore Note.

60.     Original XpresSpa was not in payment default and, indeed, had always fulfilled its payment obligations under the Rockmore Note. Bernstein and Abbe orchestrated a bad faith default by manipulating financial reporting covenants of the Rockmore Note.

61.     The term of the Rockmore Note was two years with an option to extend for an additional one-year term. Yet the covenants of the Rockmore Note required Original XpresSpa to provide audited financial statements at the end of each year. Beginning in or around early 2016, Original XpresSpa's auditors began to prepare audited financial statements. Because the term of the Rockmore Note would expire within the next twelve months, however, the auditors required

confirmation of either Rockmore's consent to extend for another one-year term or confirmation of

an agreement to refinance the note before the auditors would provide audited financial statements

without any qualification as to whether the company was a "going concern" or limitation as to the

scope of the audit.

62.     Bernstein, Abbe, and the rest of the Controlling Group decided to use, in bad faith,

the circular aspect of the financial reporting covenant in the Rockmore Note to coerce Original

XpresSpa into a merger with New XpresSpa, regardless of the Amiral merger and the other options

available to Original XpresSpa.

63.     In order to effect their plan, Bernstein caused Rockmore, in bad faith, to withhold

its consent to renew the term of the Rockmore Note. This caused Original XpresSpa's auditors to

be unable to provide audited financial statements without any qualification as to whether the

company was a "going concern" or any limitation as to the scope of the audit. Bernstein, again

acting in bad faith, then caused Rockmore to declare an event of default on the grounds that

Original XpresSpa had failed to provide audited financial statements.

64.     At first Heyer proposed that Original XpresSpa simply pay Rockmore an additional

$500,000 in exchange for a further renewal of the term.

65.     Upon information and belief, the Controlling Group then offered Heyer a *quid pro*

*quo*. In exchange for Heyer's further support of the merger with New XpresSpa, the Controlling

Group promised to grant to Heyer, individually, additional shares of New XpresSpa following the

merger and to grant Heyer's fund, Mistral, the opportunity to invest in New XpresSpa before the

merger.

66.     Heyer agreed to this *quid pro quo*, and, on or about August 8, 2016, caused Mistral

to invest $1,733,828 with New XpresSpa. On or about the same date, New XpresSpa then used

these same funds to purchase 1,733,826 Series C Preferred Units of Original XpresSpa, providing Original XpresSpa with capital that became necessary following the declaration of an event of default by Rockmore.  Heyer could have caused Mistral to make this investment of funds directly in Original XpresSpa, but in light of the undisclosed *quid pro quo* agreement with the Controlling Group, investing this capital though New XpresSpa served the interest of the Controlling Group. This transaction resulted in Mistral owning 750,574 common shares in New XpresSpa before the merger. The price paid by Mistral was $2.31 per share, which is about 8% greater than the highest price paid for the stock that day on the open market.[4]

67.     Bernstein and Heyer then urged Moreton Binn, in his capacity as a member of the board of directors of Original XpresSpa, to vote in favor of a merger with New XpresSpa despite the binding letter of intent with Amiral.

68.     The Controlling Group needed Moreton Binn's vote because Art. II, § 2.5(a) of the merger agreement required that "all directors [of Original XpresSpa] other than Bruce Bernstein: (i) approve[] and declare[] advisable this Agreement; and (ii) determine[] that the Merger and other transactions contemplated by this Agreement are advisable, fair to and in the best interests of the Company and the Company Unitholders. . . ."

#### Defendants had a Legal Duty to Make Disclosures Concerning the Merger that were Not Misleading

69.     In urging Moreton Binn to vote in favor of the merger with New XpresSpa, Heyer and Bernstein emphasized the fact that New XpresSpa's stock was listed on NASDAQ and the purported transparency and reporting that such a listing provided.

---

[4]     On January 17, 2017, less than a month after the closing of the merger, Heyer did in fact receive his *quid pro quo* in the form of an option grant of 85,000 shares at an exercise price of $2.12, which vested quarterly over a one-year period with the initial quarter of shares vesting upon grant.

70.     At a meeting of the board of directors of Original XpresSpa, held on June 14, 2016, Bernstein advised Moreton Binn and other members of the board of directors of Original XpresSpa that Rockmore "may be willing to declare the notice of default cured if certain conditions are met, including (but perhaps not limited to) Rockmore becoming comfortable that the 'V' deal is firmly in place."  The "V deal" refers to "Vringo, Inc.," the former name of New XpresSpa.

71.     By no later than August 5, 2016, Defendants Heyer and Bernstein shared with Moreton Binn copies of a draft merger agreement, in which New XpresSpa represented that "[a]s of their respective filing dates, the [Company's] SEC Documents (i) did not (or with respect to Parent SEC Documents filed after the date hereof, will not) contain any untrue statement of any material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading and (ii) complied (or will comply) in all material respects with the applicable requirements of the Exchange Act or the Securities Act, as the case may be, the Sarbanes-Oxley Act and the applicable rules and regulations of the SEC under each of those statutes, rules, and regulations. . . ."

72.     Section 12 of the Securities Act prohibits the omission of material facts necessary to make statements in such a prospectus not misleading. More specifically, Section 12 provides that "Any person who-- . . . (2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission) . . . shall be liable . . . to the person purchasing such security from him. . . ." 15 U.S.C. § 77*l*.

73.     The draft merger agreement and oral and written statements concerning the merger made by Defendants leading up to the vote by the board of directors of Original XpresSpa constituted a prospectus for purposes of the securities laws. Under the securities laws, by choosing to make statements in that prospectus, Defendants triggered a duty on their part to ensure that their statements were true and complete and not misleading by the omission of material facts.

### Defendants Made False and Misleading
### Statements Concerning the Merger

*Defendants Made False and Misleading Statements and Omitted*
*Material Facts Concerning the Rockmore Note*

74.     Defendants violated their legal duties under the securities laws by making false and misleading statements concerning the merger. For example, Bernstein and Heyer made statements to the effect that the merger with New XpresSpa was Original XpresSpa's only option. These statements were false and misleading because not only did Original XpresSpa have available to it an existing opportunity to merge with Amiral, but Moreton Binn also introduced a viable opportunity to go public through a special purpose acquisition company controlled by Icahn Associates, Inc.

75.     Bernstein told Moreton Binn that Rockmore could sell the Rockmore Note to New XpresSpa and New XpresSpa would obtain ownership over Original XpresSpa as a result of the default conditions of the Rockmore Note.

76.     This statement was misleading because it omitted the fact that Abbe at that time held both an interest in the Rockmore Note and a position on the board of New XpresSpa. Selling the note directly to New XpresSpa would not have been as beneficial for Bernstein and Abbe as an assignment of the obligations under note, which would put Bernstein and Abbe in the position of control over New XpresSpa that could then be used to obtain substantial monetary compensation and equity for Bernstein and Abbe.

77.     Bernstein's statements to Moreton Binn concerning a possible sale of the Rockmore Note were merely half-truths told to coerce Mr. Binn to vote in favor of the merger. Under the terms of the proposed merger agreement, a unanimous vote of the board of Original XpresSpa was required in order to proceed with the merger.

*Defendants Made False and Misleading Statements and Omitted*
*Material Facts Concerning the Independence of the Defendants*

78.     In its S.E.C. filings in early 2016, New XpresSpa disclosed that the Controlling Group were members of its board of directors. New XpresSpa also represented that the composition of its board of directors including the members of the Controlling Group satisfied all requirements for independence under applicable law and the NASDAQ listing rules.

79.     The Sarbanes-Oxley Act of 2002 provides for requirements as to the independence of members of the audit committee of publicly-listed companies. More specifically, 15 U.S.C. § 78j-1(m)(3) provides that "(A) . . . Each member of the audit committee of the issuer shall be a member of the board of directors of the issuer, and shall otherwise be independent. (B) . . . In order to be considered to be independent for purposes of this paragraph, a member of an audit committee of an issuer may not, other than in his or her capacity as a member of the audit committee, the board of directors, or any other board committee-- (i) accept any consulting, advisory, or other compensatory fee from the issuer; or (ii) be an affiliated person of the issuer or any subsidiary thereof."

80.     17 CFR § 240.10a-3 provides that "(ii) . . . In order to be considered to be independent for purposes of this paragraph (b)(1), a member of an audit committee of a listed issuer that is not an investment company may not, other than in his or her capacity as a member of the audit committee, the board of directors, or any other board committee: (A) Accept directly or indirectly any consulting, advisory, or other compensatory fee from the issuer or any subsidiary

thereof, provided that, unless the rules of the national securities exchange or national securities association provide otherwise, compensatory fees do not include the receipt of fixed amounts of compensation under a retirement plan (including deferred compensation) for prior service with the listed issuer (provided that such compensation is not contingent in any way on continued service); or (B) Be an affiliated person of the issuer or any subsidiary thereof."

81.     17 C.F.R. § 230.405 defines "affiliate" as "a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified." and "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

82.     Issuers listed on NASDAQ are required to comply with rules set forth by NASDAQ. Rule 5605(a)(2) of the NASDAQ Stock Market Rules defines "independent director" as "a person other than an Executive Officer or employee of New XpresSpa or any other individual having a relationship which, in the opinion of New XpresSpa's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director."

83.     Rule IM-5605 of the NASDAQ Stock Market provides that "[i]t is important for investors to have confidence that individuals serving as Independent Directors do not have a relationship with the listed Company that would impair their independence. The board has a responsibility to make an affirmative determination that no such relationships exist through the application of Rule 5605(a)(2)."

84.     Defendants' statements concerning the composition of the board and its independence leading up to the vote by the board of Original XpresSpa were misleading because

they stated or otherwise suggested that a board including Bernstein, Abbe, Perlman, and Giardina would continue to satisfy requirements for independence following the merger.

85.     Following the merger, New XpresSpa's board would not qualify as independent because, *inter alia*, by way of the merger New XpresSpa would assume the obligations under the Rockmore Note, which Bernstein would still control and in which Abbe would continue to hold an economic interest.

86.     As mentioned above, Bernstein also represented that the Rockmore Note would be paid off in full shortly following the contemplated merger. This statement was false because the Controlling Group secretly intended not to pay off this obligation and, instead, to use it to exert undue control over New XpresSpa, a public company listed on NASDAQ.

87.     Defendants also failed to disclose and omitted material facts concerning their numerous and overlapping business relationships. Specifically, Defendants failed to disclose that Abbe's investment company, Iroquois, filed a lawsuit against NHC at the time that Giardina was a member of the board and chairman of the NHC's audit committee. Despite significant changes to the board of NHC as part of the settlement of the lawsuit, including the appointment of Abbe and his then-investment partner to NHC's board, Giardina remained on the Board and Chairman of the Audit Committee after Iroquois's investment and litigation.

88.     Similarly, Defendants failed to disclose in any of the filings with the SEC prior to the close of the merger that Bernstein had been appointed to the board of directors of Neurotrope, at the direction of Abbe, as of November 14, 2016.  Bernstein's appointment to the Neurotrope board at the direction of Abbe was a *quid pro quo* for Bernstein's assistance in facilitating the merger with New XpresSpa.

89.     These undisclosed business relationships between the directors belie the claims of director independence made by Perlman and the other members of the Controlling Group in New XpresSpa's prospectuses, proxy statements, and other statements.

90.     By disseminating prospectuses and proxy statements including statements concerning the relationship between directors and Rockmore, the independence of the board post-merger, and the other facts described above, Perlman and the other members of the Controlling Group had a duty to investigate the truth and accuracy of the representations made therein and to disclose fully the additional business relationships between the members of the Controlling Group that had been appointed to the board of New XpresSpa.

91.     Long after the closing of the merger, Defendants amended New XpresSpa's Form 10-K annual report to disclose for the first time information about Perlman's and Bernstein's board positions at Neurotrope. This amendment further demonstrates the Defendants' own recognition of the materiality of such information and that the failure to disclose such information constitutes a violation of the securities laws.

### Plaintiff Relied Upon the Truthfulness and Completeness of Defendants' Statements in Voting in Favor of the Merger

92.     On August 8, 2016, New XpresSpa entered into the merger agreement with Original XpresSpa and filed with the SEC a prospectus disclosing the terms of the agreement and an investor presentation. In the prospectus, New XpresSpa stated that the proposed post-merger board of directors would include the Controlling Group and also Defendants Heyer, Engelman, and Stout.

93.     At or around the same time, Bernstein and Heyer caused Original XpresSpa to amend its operating agreement to add New XpresSpa as a member. The amendment also provided to New XpresSpa effective control over any strategic decisions concerning Original XpresSpa. By

these actions, by August 8, 2016, Defendants had obtained effective control over both New XpresSpa and Original XpresSpa.

94.     As the controlling members of Original XpresSpa and the controlling directors of New XpresSpa, Defendants controlled the terms of the merger. Defendants then began to use this control to mold the terms of the merger to serve their own selfish interests. For example, they amended the merger agreement to increase substantially the proportion of the Merger Consideration to be held in escrow by an additional $2 million, thereby placing more of the Merger Consideration under their control during the escrow period that would follow the merger. The Defendants intended ultimately to charge inflated costs and expenses against this Merger Consideration.

95.     At no time before the closing of the merger did Heyer or Bernstein disclose to the other members of Original XpresSpa the *quid pro quo* between the Controlling Group and Heyer or the undue control that Bernstein would enjoy over New XpresSpa, following the merger, by way of his position on the board of New XpresSpa and the Rockmore Note.

96.     Section 8.04(b) of the operating agreement of Original XpresSpa in effect at the time (the "Operating Agreement") provides that in a sale of the company all members must be offered the same terms. Plaintiff relied on the board of Original XpresSpa, including Heyer, who controlled the board, to offer to Plaintiff the same terms offered to any other member of Original XpresSpa.

97.     As described above, by way of the *quid pro quo* transaction with the Controlling Group, Heyer received terms more beneficial than Plaintiff but never offered or even disclosed such terms to Plaintiff. Heyer's acceptance of the *quid pro quo* and concealment of those terms from Plaintiff constitutes a violation of the securities laws.

**Defendants Made Further Misrepresentations and Omissions
in Proxy Statements and Prospectuses in Order to Induce Plaintiff to
Execute the Joinder Agreements**

98.     Between September 9, 2016 through October 28, 2016, New XpresSpa filed with the S.E.C. various prospectuses, statements, disclosures, and proxy statements, including a Form S-4 proxy statement, in connection with the merger. Among these materials were forms of "Joinder Agreements" whereby the members of Original XpresSpa, such as Plaintiff, would legally join the merger agreement as parties.

99.     In the various prospectuses, statements, disclosures, and proxy statements filed by Defendants between September 9, 2016 and October 28, 2016, Defendants solicited the execution of Joinder Agreements by members of Original XpresSpa because Art. VI, § 6.2(m) of the Merger Agreement between Original XpresSpa and New XpresSpa provides as a condition to closing that members of Original XpresSpa representing at least 95% of the total membership interests of that company must sign Joinder Agreements.

100.    Pursuant to Section 12 of the Securities Act, and regulations promulgated thereunder, Defendants had a legal duty not to make any statements in their prospectuses, including those disseminated to members of Original XpresSpa between September 9, 2016 and October 28, 2016, that would be misleading by way of the omission of material facts.

101.    Section 14 of the Exchange Act prohibits the omission from proxy statements of material facts necessary to make such a proxy statement not misleading. 17 CFR § 240.14a-9(a), promulgated pursuant to Section 14 of the Exchange Act, prohibits solicitation by means of a proxy statement containing "any statement which, at the time and in the light of the circumstances under which it is made . . . omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 CFR § 240.14a-9(a).

102.    As signatories to a Form S-4 proxy statement, and amendments thereto, the individual defendants Perlman, Bernstein, Stout, Engelman, Giardina, and Abbe each had a personal duty to ensure the statements contained therein complied with the foregoing laws and regulations.

103.    Accordingly, by making disclosures in proxy statements and disseminating those materials to Plaintiff, Defendants had a legal duty to ensure that they were not telling half-truths that would mislead Plaintiff by omitting material facts necessary to make such statements not misleading.

104.    In the Form S-4 proxy statement filed by New XpresSpa on September 9, 2016, Defendants disclosed that the Controlling Group had an interest in continuing to serve as members of the board of directors following the merger and that Bernstein had a controlling interest in the Rockmore Note.

105.    Defendants failed to disclose in the Form S-4 that Abbe held an interest in the Rockmore Note and that by way of their control over and interest in the Rockmore Note, Bernstein and Abbe would have undue control over the operations of a post-merger New XpresSpa. Nonetheless, Defendants represented that "[t]he FORM board of directors was aware of and considered these interests, among other matters, in evaluating and negotiating the Merger Agreement and in recommending that FORM stockholders approve the FORM Merger Proposal. . . ."

106.    In an amended form S-4 proxy statement filed with the SEC on October 26, 2016, Defendants represented that "Following the completion of the Merger, FORM is initially expected to have a seven-member board of directors, comprised of Andrew D. Perlman, John Engelman, Donald E. Stout, Salvatore Giardina, Bruce T. Bernstein and Richard J. Abbe, all of whom are

currently members of the FORM board of directors, and Andrew R. Heyer, who is currently a member of the XpresSpa board of directors. Each of John Engelman, Donald E. Stout, Salvatore Giardina, Bruce T. Bernstein, Andrew R. Heyer, and Richard K. Abbe will be deemed 'independent' in accordance with the standards set by [NASDAQ]. Each of Messrs. Engelman, Stout, Giardina, Bernstein and Abbe will also be deemed 'independent' in accordance with Rule 10A-3 promulgated under the Securities Exchange Act of 1934, as amended, or the Exchange Act. Accordingly, the board of directors of FORM will be comprised of a majority of independent directors as required by [NASDAQ]. . . ."

107.    The foregoing statements were false and misleading because of, *inter alia*, the omission of the fact that Abbe owned an interest in the Rockmore Note, the undue control that Bernstein and Abbe would have over New XpresSpa, the existence of the Controlling Group, and the Controlling Groups' history of using debt facilities to exert undue control over public companies.

108.    In their proxy statements and other materials, Defendants also represented that "the terms of the [Rockmore Note] were reflective of market rates as of the time of issuance. . . ." This statement was false and materially misleading because the terms of the Rockmore Note are onerous on their face.

109.    Specifically, the Rockmore Note, as amended, provides for base monthly interest, ranging from 8.5% to 10%, depending on whether the maturity date of the loan is extended to May 2019, plus accrued monthly interest of 2% annual interest, calculated on a monthly basis. According to New XpresSpa's public filings prior to the completion of the merger, the Rockmore Note accrues interest of 9.24% per annum, payable monthly, plus an additional 2.0% per annum,

and matures on May 1, 2019, with an additional one-year extension if both New XpresSpa and Rockmore consent to such extension.

110.    On their face, these terms were not reflective of market terms at the time. Accordingly, Defendants' representations concerning the terms of the Rockmore Note were misleading.

111.    The proxy statements described how, as consideration for the merger, Plaintiff and the other legacy members of Original XpresSpa would receive Merger Consideration comprising common stock warrants, convertible preferred stock and common stock of New XpresSpa.

112.    This valuation of the Merger Consideration stated in the Form S-4 and elsewhere was false and misleading because Defendants had inflated the value of the remaining patent monetization assets on the books of New XpresSpa knowing they would, and intending to, liquidate those assets for much less soon after the merger.

113.    Likewise, Defendants also caused the valuation to be inflated by inflating the amount of cash assets held by New XpresSpa and represented that such cash would be available for investment into growing the airport spa business following the merger. Defendants secretly intended to distribute any substantial cash before the closing of the merger and knew that substantially none of the promised cash used to value the Merger Consideration would actually be available for investment in the operating spa business following the merger.

**Bernstein and Phoenix Fraudulently Induced
Plaintiff to Execute the Joinder Agreement**

114.    Pursuant to the operating agreement of Original XpresSpa in place at the time, Plaintiff was entitled to certain pre-emptive rights as a result of the merger. When Plaintiff contacted management to exercise his preemptive rights, Bernstein and Phoenix made material misrepresentations and omissions for the purpose of obtaining Plaintiff's signature of the Joinder

Agreement. More specifically, Phoenix organized a conference call with Bernstein and Plaintiff to discuss Plaintiff's preemptive rights. In a follow-up email to Plaintiff dated December 27, 2016, Bruce Bernstein represented that "without signing the Joinder Agreement, you will not be able to receive the new securities in Form that will be given in exchange for the Xspa shares. . . ." This statement was false.

115.    Section 8.04(b) of the Operating Agreement provides that "no Holder [e.g., Plaintiff] shall be required to execute and deliver any such agreements unless all Holders are so required. . . ." Section 2.5 of the Merger Agreement between Original XpresSpa and New XpresSpa provides that the board of directors of Original XpresSpa has approved the merger and that its approval "is the only vote necessary to approve and adopt this Agreement, the Merger and other transactions contemplated hereby and no vote of the Company Unitholders is required by the Company Operating Agreement or any applicable law. Section 6.2(m) of the Merger Agreement between Original XpresSpa and New XpresSpa sets as a condition to proceeding with the merger that New XpresSpa receive Joinder Agreements from members representing 95% of the total membership interests of Original XpresSpa. At the time of the merger, Plaintiff held an interest in Original XpresSpa that was less than 5% and, therefore, he was entitled to receive his proportional share of the Merger Consideration without signing a Joinder Agreement. Further, Plaintiff had the right to exercise certain pre-emptive rights in connection with the merger, whereby he was entitled to purchase additional shares on agreed upon specified terms, all without being required to sign a Joinder Agreement.

116.    At the time they were discussing these matters with Plaintiff, Bernstein and Phoenix knew that Bernstein's statement regarding the purported necessity of executing a Joinder Agreemetn was false or acted recklessness with respect to the truthfulness of that statement. Yet

neither Bernstein nor Phoenix did anything to correct Bernstein's false statement or otherwise advise Plaintiff that he was not required to execute a Joinder Agreement in order to exercise his preemptive rights.

117.    The Joinder Agreement includes broad releases of not only the Defendants[5] but also the affiliate of Heyer that was designated to maintain the Merger Consideration in escrow following the merger. The Joinder Agreement also provides to Heyer's affiliate, for whom Phoenix in the capacity of an officer or agent, extensive rights over the Merger Consideration. As described in the proxy statements and other materials, the Merger Consideration would be held in escrow for a period of eighteen months following the closing of the merger. During this post-merger escrow period, the Merger Consideration would be controlled by Heyer, through a Mistral affiliate for whom Phoenix acted as an agent or officer.

118.    Defendants' proxy statements, however, failed to disclose and concealed that, in order to induce Perlman and Heyer to bring the merger to a closing, Bernstein and Abbe entered into undisclosed *quid pro quo* agreements to grant to Perlman and Heyer additional equity compensation, not disclosed in the proxy statements, after the closing of the merger.

119.    In exchange for Perlman's cooperation in furthering the scheme, the Controlling Group, with the specific assistance of Bernstein as Chair of the Compensation Committee and Stout as a member of the Compensation Committee, agreed to amend the executive compensation of New XpresSpa to authorize the Compensation Committee to grant the maximum amount of equity compensation permitted and to grant to Perlman, after the merger, a *quid pro quo* in the

---

[5]        Pursuant to 15 U.S.C. § 78cc, that portion of the joinder agreement purporting to release the Defendants from liabilities under the securities laws are void. In the action *Binn, et al. v. Bernstein, et al.*, Case No.17-cv-8594 (SDNY)(LSS), the Court dismissed common law claims against similar defendants in light of the release in the Joinder Agreement. Plaintiff reserves the right to bring similar common law claims in the event the Court's dismissal of common law claims in *Binn v. Bernstein* is reversed on appeal.

form of the maximum amount of equity compensation allowable under New XpresSpa's newly amended executive compensation plan and, also, to appoint Perlman to the Board of Neurotrope,[6] another public company controlled by Abbe and Bernstein.

120.   These *quid pro quo* agreements were not disclosed in the proxy statements and concealed from Plaintiff. As such, Plaintiff could not have known of these *quid pro quo* arrangements before Bernstein falsely stated that Plaintiff was required to sign the Joinder Agreement.

121.   In reliance on the truthfulness and completeness of the statements made by Defendants, including the statement in Defendants' Form S-4 proxy statement, amendments thereto, and Bernstein's statement that Plaintiff was required to sign the Joinder Agreement, Plaintiff not only executed a Joinder Agreement in connection with the merger but also paid an additional USD $57,500 in exercise of his preemptive rights with respect to Original XpresSpa.

**Loss Causation**

122.   Plaintiff would not have exercised his pre-emptive rights or otherwise signed the Joinder Agreement had he known of the facts omitted from Defendants' prospectuses, proxy statements, and oral communications, including the *quid pro quos*, the truth regarding Defendants' lack of independence and the other material facts described above. Had the truth been disclosed, the Merger Consideration would have been appraised at near zero or a value substantially lower than represented to Plaintiff. The merger would not have closed, because the shares of common and preferred stock delivered as the merger consideration were tainted by undisclosed control and influence of the Controlling Group.

---

[6]     On June 19, 2018, Perlman resigned from Neurotrope's board of directors, causing Neurotrope to fail to satisfy a continued listing rule or standard of NASDAQ.

123.    Defendants' fraudulent inducement of Plaintiff into signing the Joinder Agreement deprived Plaintiff of valuable legal claims he could have asserted against Heyer, Mistral, and their affiliates, thereby causing Plaintiff losses.

124.    Further, during the relevant period, the individual Defendants Engelman and Stout acted as directors of New XpresSpa and, in that capacity, signed reports, proxy statements, and other materials filed with the SEC.  As such, they had a duty to obtain knowledge of the truth and accuracy of the disclosures made in materials filed with the SEC before signing or authorizing the filing of such materials.  Engelman and Stout misrepresented, by omission or otherwise, the true nature of the relationship between the Controlling Group by deliberately refraining from taking those steps necessary to discover whether statements by the Controlling Group and New XpresSpa were false or misleading. In addition, Stout, as a member of the Compensation Committee did not take any steps to prevent the *quid pro quo* compensation paid to Heyer.

125.    When discussing the merger, Defendants misrepresented New XpresSpa as a going concern with multiple business interests, revenues, and capital that could be used to grow the XpresSpa business. But Defendants knew or should have known that they would soon be exiting the remaining other businesses, were losing money each quarter, and would not have significant cash to invest in XpresSpa without a further capital raise. In short, New XpresSpa had no intrinsic or ongoing value.

126.    If the Defendants' representation of New XpresSpa's relative financial condition were accurate, the price of the stock would have approximately doubled upon the closing of the merger in December 2016, thereby causing the warrants exchanged as part of the Merger Consideration to be in the money. This did not happen and the stock price actually fell because Defendants' representations concerning the assets of New XpresSpa were false.

127.    The Defendants' misrepresentations and omissions resulted in the exchange of the Merger Consideration at prices that were artificially inflated, causing substantial losses to Plaintiff.

**Defendants' Post-Merger Conduct Continues
to Cause Losses to Plaintiff**

128.    After the merger, the Controlling Group used their undue control and power over New XpresSpa to operate the business for their own selfish interests and otherwise engage in conduct that a truly independent board would not have taken, all to the detriment of the underlying operating business, the stock price, and Plaintiff.

129.    During the years before the merger, Original XpresSpa had assembled a team of 32 experienced staff that had played an important role in growing the business of Original XpresSpa over the years. These staff had valuable experience in the successful bidding and build-out of important airport spa locations.

130.    Nonetheless, following the merger, the Controlling Group fired these professionals, thereby hobbling New XpresSpa's ability to successfully bid for and build-out airport spa locations. Since these terminations, New XpresSpa has lost several valuable locations to its competitor, Amiral. Substantially all of the locations opened after the merger were the result of work performed before the merger by Original XpresSpa's team of experienced staff.

131.    The Controlling Group has also fired experienced managers of spa locations.

132.    The squandering of experienced and capable staff has resulted in losses to competitors of valuable airport concession locations and has negatively impacted the long-term success of New XpresSpa and its share price.

133.    At the same time the Controlling Group was terminating New XpresSpa's experienced staff, the Controlling Group awarded themselves the maximum compensation permitted under New XpresSpa's amended executive compensation plan and increased the

compensation of their acolytes at New XpresSpa in addition to granting to themselves below market pricing on equity offerings.

134.    Knowing that, by way of the Rockmore Note, they had full control over and security in the operating assets of New XpresSpa, the Controlling Group caused the majority of the Merger Consideration to be diluted in value and otherwise improperly allocated against expenses of New XpresSpa.

135.    The post-merger equity offerings and grants substantially diluted Plaintiff's interests and the consideration for the merger. Yet Bernstein and Abbe have used their undue control over New XpresSpa to maintain substantially the same equity positions they held immediately after the merger all without investing any new capital of their own in exchange for maintaining similar equity positions.

136.    As of the date the Merger Consideration was priced, the stock price was approximately $2.30.

137.    As information concerning the Controlling Group's prior relationships, including disclosures in May 2017 that Giardina previously held a board position at NHC and Bernstein's role on the board of Neurotrope, and New XpresSpa's need for additional capital for operations, disclosed on July 26, 2017, the stock price began to drop steadily.

138.    As of market close on February 19, 2019, the stock price was $0.19.[7]

139.    The Controlling Group also used the escrow of the Merger Consideration as a manipulative device to deprive Plaintiff of the benefit of the bargain offered to him in New XpresSpa's prospectuses, proxy statements, and other communications.

---

[7]    In the first quarter of 2019, New XpresSpa effected a 1-for-20 reverse split.

140.     For example, at the same time that the Controlling Group was scheming to take over control and effect the merger, they knew that proceeding with a merger with New XpresSpa instead of Amiral would necessarily result in a breach of Amiral's right-of-first-refusal. Yet following the merger, the same Controlling Group that caused the beach of the obligation to Amiral, and the resulting damages claim, then proceeded to charge the entire amount of those damages to be assessed only against Merger Consideration held in escrow for Plaintiff and the other former members of Original XpresSpa.

141.     Significantly, as a result of the escrow arrangement orchestrated by Defendants, over 30% of the consideration offered to Plaintiff in connection with the merger, continues to remain in escrow under Defendants' control.

**Scienter**

142.     As detailed above, Defendants had both the motive and opportunity to make the foregoing fraudulent misrepresentations and commit violations of the securities laws. The Defendants who were on the board of New XpresSpa prior to the merger were motivated to move forward with the merger because New XpresSpa did not have a business likely to generate significant cash revenue after the settlement with ZTE in December 2015. In addition, the other Defendants had the opportunity presented to them by Abbe and Bernstein.

143.     Bernstein was motivated to move forward with the merger because it provided him with an opportunity to use the Rockmore Note, which, in fact, does not include his own funds, to gain significant influence over a public company listed on NASDAQ (New XpresSpa) and to extract unwarranted monetary compensation and stock options. Bernstein was also motivated to fraudulently induce Plaintiff into signing the Joinder Agreement in order to obtain the benefit of

the broad and expansive releases contained therein, thereby insulating himself from certain legal claims at the expense of Plaintiff.

144.    Abbe was similarly motivated to move forward with the merger because it allowed him to see his investment in the Rockmore Note transferred to being a liability of a public company listed on NASDAQ and provided him with the opportunity to receive unwarranted monetary compensation and stock options.

145.    As detailed above, there is strong circumstantial evidence of *quid pro quo* arrangements provided to Heyer, Perlman, and Bernstein to entice them to move forward with the merger pursuant to terms that were detrimental to Plaintiff.

**COUNT I**
**Violation of § 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(against all Defendants)**

146.    Plaintiff repeats, restates, and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

147.    Beginning in December 2015 and continuing today, Defendants have carried out a plan, scheme, and course of conduct, which was intended to, and did: (i) deceive Plaintiff, as alleged herein; and (ii) cause Plaintiff to purchase New XpresSpa stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the individual Defendants took the actions set forth herein, including but not limited to obtaining and circulating an inaccurate and misleading alleged valuation of the purchase consideration and passing it off as a valuation of the XpresSpa business; failing to provide complete documents setting forth the rights and obligations of the parties concerning the merger, including the Joinder Agreement, prior to obtaining executed signature pages for those agreements; Bernstein's use of the Rockmore Note as leverage to coerce the members of the board of XpresSpa to vote in favor of the merger with

New XpresSpa; Bernstein and Perlman's promise to Heyer of a *quid pro quo* of additional options in New XpresSpa awarded after the close of the merger; and the board of directors' failure to disclose Abbe's financial interest in the Rockmore Note.

148.    As specifically detailed herein, Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of New XpresSpa's stock in an effort to benefit Defendants at the expense of shareholders and New XpresSpa, in violation of §10(b) of the Exchange Act and Rule 10b-5.

149.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal adverse material information about the lack of independence of Bernstein and Abbe, the *quid pro qu*o provided to Heyer, and the prior relationships between the Controlling Group and their investment vehicles, as alleged herein.

150.    Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the benefits of the merger with New XpresSpa, Bernstein's purported independence, and the lock-up period of the offering.  These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the foregoing not misleading.  As set forth more particularly herein, Defendants further engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon Plaintiff. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set

forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about the foregoing from the investing public.  Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

151.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, Defendants awarded to themselves and their acolytes compensation and other amounts at the expense of New XpresSpa and its shareholders, the results of which caused damage to Plaintiff.

152.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of Original XpresSpa were ignorant of their falsity and reasonably believed them to be true.

153.   Had Plaintiff known the truth regarding the foregoing, which was not disclosed by Defendants, Plaintiff would not have exercised his preemptive rights or signed the Joinder Agreement or otherwise purchased or otherwise acquired New XpresSpa stock.

154.   By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

155.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with his respective purchases of New XpresSpa stock.

**COUNT II**
**Violation of § 20 of the Exchange Act**
**(against the Controlling Group Defendants)**

156.   Plaintiff repeats, restates, and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

157.   The Controlling Group Defendants acted as controlling persons of New XpresSpa within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high level positions, ownership and contractual rights, participation in and/or awareness of New XpresSpa's operations, and/or intimate knowledge of the false statements filed by New XpresSpa with the SEC and disseminated to the investing public, the Controlling Group Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of New XpresSpa, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Controlling Group Defendants were provided with or had unlimited access to copies of New XpresSpa's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

158.   In particular, members of the Controlling Group Defendants, including Perlman, had direct and supervisory involvement in the day-to-day operations of New XpresSpa and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

159.   As set forth above, Bernstein, Abbe, Perlman, and Giardina violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Controlling Group Defendants are liable pursuant to §20(a) of the

Exchange Act.  As a direct and proximate result of the individual Defendants' wrongful conduct, Plaintiff suffered damages in connection with his purchase of New XpresSpa's stock.

## COUNT III
### Violation of § 12(2) of the Securities Act
### (against New XpresSpa and the Controlling Group Defendants)

160.    Plaintiff repeats, restates, and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

161.    As described in detail above, the Controlling Group Defendants formed a group of shareholders with aligned interests and for the purpose of exercising undue control over XpresSpa and the Series D preferred shares held in escrow to the detriment of Plaintiff's interests.

162.    As described above, the Controlling Group Defendants caused to be filed proxy statements, prospectuses, and other documents in connection with the sale of securities to Plaintiff.

163.    The Controlling Group Defendants misrepresented and/or omitted facts necessary to make their statements not misleading in violation of Section 12(2).

164.    Plaintiff relied on the Controlling Group Defendants to comply with the securities laws and to make any required filings necessary to provide them with adequate disclosure and transparency concerning their proposed investment in XpresSpa.

165.    As a result, the Controlling Group Defendants' violations of Section 12(2) of the Securities Act, Plaintiff has suffered harm and damages.

## COUNT IV
### Breach of Contract
### (against New XpresSpa)

166.    Plaintiff repeats, restates, and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

167.    As set forth above, the Merger Agreement and related instruments constitute a binding and enforceable contract between Plaintiff and New XpresSpa.

168.    Defendants made representations to Plaintiff in the Merger Agreement and related instruments. The forgoing representations by Defendants were false, materially misleading, or otherwise omitted material facts at the time Defendants made them.

169.    The foregoing misrepresentations constitute material breaches of the Merger Agreement.

170.    By way of the foregoing breaches of the Merger Agreement, Plaintiff has suffered damages.

## COUNT IV
### Fraud in the Inducement
### (against Bruce Bernstein)

171.    Plaintiff repeats, restates, and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

172.    In discussions with Plaintiff, Bernstein represented that Plaintiff was required to sign the Joinder Agreement in order to receive shares of New XpresSpa in exchange for Plaintiff's equity interest in Original XpresSpa. This representation was false because the plain terms of the merger agreement and related documents make clear that Plaintiff was entitled to exercise his preemptive rights and otherwise exchange his interest in Original XpresSpa for shares of New XpresSpa without signing a Joinder Agreement. In making these representations, Bernstein did not disclose that Plaintiff was not obligated to sign the Joinder Agreement.

173.    Bernstein's representations and omissions were materially misleading. By claiming that Plaintiff was required to sign the Joinder Agreement, without disclosing the truth, Bernstein misled Plaintiff into executing a legal instrument that materially affected Plaintiff's rights and obligations. More specifically, the Joinder Agreement purports to release Bernstein, Mistral, and others of all liability for their misconduct in connection with the merger. The Joinder Agreement

further operated as a delegation of authority to Mistral to control all of the Series D preferred shares and other equity received by Plaintiff, all of which deprived Plaintiff of material and substantial legal rights. Had Plaintiff known that he could have proceeded with the exercise of his preemptive rights and exchange of shares without executing the Joinder Agreement, he would not have done so.

174.    Bernstein knew his representations and omissions were materially misleading because he knew the terms of the merger agreement, the Joinder Agreement, and the related documents. Bernstein had negotiated these documents from both sides of the table – *i.e.*, in his capacity as a director of Original XpresSpa and also as a director of New XpresSpa. Bernstein also knew that Plaintiff did not desire to sign the Joinder Agreement because Plaintiff had previously stated so in writing to Bernstein.

175.    Bernstein deliberately and intentionally made these material misrepresentations and omissions with the intent to induce Plaintiff to rely on them in executing the Joinder Agreement, thereby purporting to relinquish substantial legal rights vis-à-vis Bernstein, Mistral, and others.

176.    Plaintiff reasonably relied on Bernstein's representations by executing the Joinder Agreement in late December 2016, purporting to relinquish legal rights vis-à-vis Bernstein, Mistral, and others.

177.    Plaintiff has been injured in an amount to be determined at trial, but in no event less than $1.8 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, and in favor of Plaintiff as follows:

**(a)**    Awarding to Plaintiff damages in an amount to be determined at trial;

**(b)**    Rescission of the merger or the monetary equivalent of rescission;

**(c)**     Consequential damages;

**(d)**     Disgorgement;

**(e)**     Equitable and/or injunctive relief as necessary or permitted by law and equity, including disgorgement, attachment, impoundment, and/or imposition of a constructive trust on or otherwise restricting the disposition/exercise of the stock compensations awards described herein;

**(f)**     Equitable subordination of all secured debt currently owned or controlled by Bernstein and Abbe.

**(g)**     Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

**(h)**     Awarding to Plaintiff pre-judgment interest and post-judgment interest;

**(i)**     Granting Plaintiff such other and further relief as this Court deems just and proper.


## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury as to all claims so triable.

Dated: New York, New York                  CKR LAW LLP
       March 20, 2019

                             By:    _/s/ Michael James Maloney_
                                   Rosanne E. Felicello
                                   Michael James Maloney
                       1330 Avenue of the Americas
                       14th Floor
                       New York, New York 10019
                       Tel. (212) 259-7300
                       rfelicello@ckrlaw.com
                       mmaloney@ckrlaw.com

                       *Attorneys for Plaintiff Roman Kainz*